## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JEFFREY W. STEVENSON,         )
)
        Plaintiff,        )
)
    v.                     )
)
J. P. MORGAN RETIREMENT PLAN    )
SERVICES LLC, a Limited Liability    )
Company,                     )
)
        Defendant.       )
)

```
FILED: MAY 21, 2008
08CV2947      TC
JUDGE HART
Case No.  MAGISTRATE JUDGE VALDEZ
```

### NOTICE OF REMOVAL

Petitioner J.P. Morgan Retirement Plan Services LLC ("RPS"), pursuant to 28

U.S.C. §§ 1332, 1441, and 1446, hereby removes this action, which had been pending as Case

No. 08 CH 14177 in the Circuit Court of Cook County, Illinois (the "Action"), to the United

States District Court for the Northern District of Illinois, Eastern Division. In support of this

action, RPS states as follows:

1.      On April 29, 2008, plaintiff Jeffrey Stevenson ("Stevenson") served RPS with a

Summons and Complaint in the Action, copies of which are attached as Exhibit A hereto.

2.      The Complaint alleges claims against RPS for breach of contract, for declaratory

judgment, under the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.*, and

under the Illinois Attorneys Fees in Wage Actions Act, 225 ILCS 225/1.

3.      Stevenson was at the time the Complaint was filed, and currently is, a citizen of

and resides in the State of Illinois. *See* Complaint at ¶ 1.

4.      RPS was at the time the Complaint was filed, and currently is, a limited liability

company. RPS is wholly owned by J.P. Morgan Invest Holdings LLC, a limited liability

company. J.P. Morgan Invest Holdings LLC is wholly owned by JPMorgan Chase & Co. JPMorgan Chase & Co is a Delaware corporation with its principle place of business in New York. Thus, for jurisdictional purposes, RPS is a citizen of Delaware and of New York.

5.      Complete diversity of citizenship therefore exists between Stevenson and RPS.

6.      As the Complaint's allegations make clear, Stevenson seeks actual damages well in excess of $75,000. Stevenson seeks at least $107,884.60 in wages, as well as bonus payments and retirement, health and income protection benefits. *See* Complaint at ¶¶ 58, 69, 72 and Ex. C.

7.      This Court therefore has original jurisdiction of the Action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

8.      This Notice of Removal is timely because it was filed within 30 days after RPS was served with a copy of the Complaint and Summons in the Action.

9.      A copy of this Notice of Removal is being filed concurrently with the Clerk of the Circuit Court of Cook County, Illinois, and is being served on all counsel of record. *See* 28 U.S.C. § 1446(a) and (d). The Circuit Court of Cook County, Illinois, is located within this District and Division.

WHEREFORE, Petitioner J.P. Morgan Retirement Plan Services LLC prays that the above-titled cause of action, currently pending in the Circuit Court of Cook County, Illinois, be removed to the United States District Court for the Northern District of Illinois, Eastern Division, and proceed in this court as an action properly so removed.

2

Respectfully submitted,

J. P. MORGAN RETIREMENT PLAN
SERVICES LLC


By: _____ */s/ Sarah M. Konsky* _____
               One of Its Attorneys

Brian J. Gold
Sarah M. Konsky
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

**CT CORPORATION**
A WoltersKluwer Company

**Service of Process Transmittal**
04/29/2008
CT Log Number 513367743

**TO:**    Carl Del Vecchio
JPMorgan Chase Bank, N.A.
1 Chase Manhattan Plaza – 20th Floor, Legal Department
New York, NY 10081-

**RE:**    **Process Served in Illinois**

**FOR:**   J.P. Morgan Retirement Plan Services LLC (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Jeffrey W. Stevenson, Pltf. vs. J. P. Morgan Retirement Plan Services LLC, etc., Dft. Name discrepancy noted. |
| **DOCUMENT(S) SERVED:** | Summons (2 sets), Complaint, Exhibit(s) |
| **COURT/AGENCY:** | Cook County Circuit Court, County Department, Chancery Division, IL Case # 08CH14177 |
| **NATURE OF ACTION:** | Seeking Declaratory Judgment – Breach of Contract for unpaid final compensation as provided in the Emloyment Agreement – Unpaid Earn Out bonus |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Chicago, IL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 04/29/2008 at 09:30 |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days, not counting the day of service |
| **ATTORNEY(S) / SENDER(S):** | Christopher N. Mammel Childress Duffy Goldblatt, Ltd. 515 North State Street Suite 2200 Chicago, IL 60610 312-494-0200 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 04/29/2008, Expected Purge Date: 05/04/2008 Image SOP - Page(s): 34 Email Notification, Legal Papers Served legal.papers.served@jpmchase.com CC Recipient(s) Teresa Goldberg, via Customer Pick-up |
| **SIGNED:** | C T Corporation System |
| **PER:** | Tawana Carter |
| **ADDRESS:** | 208 South LaSalle Street Suite 814 Chicago, IL 60604 |
| **TELEPHONE:** | 312-345-4336 |

Page 1 of 1 / FR

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



**EXHIBIT**

tabbles

**A**

| 2120 - Served | 2121 - Served | |
|---|---|---|
| 2220 - Not Served | 2221 - Not Served | |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| SUMMONS | ALIAS - SUMMONS | CCG N001-10M-1-07-05 ( ) |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, __CHANCERY__ DIVISION

(Name all parties)

Jeffrey W. Stevenson
_____

v.

J.P. Morgan Retirement Plan Services LLC
_____

} 

**08CH14177**

No. _____

Sheriff please serve Defendant
J.P. Morgan Retirement Plan Services L
by serving its Registered Agent
CT Corporation System
208 South LaSalle St., Ste. 814
Chicago, IL 60604

**SUMMONS**

To each Defendant:

   YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

   ☐  Richard J. Daley Center, 50 W. Washington, Room __802__, Chicago, Illinois 60602

   ☐  District 2 - Skokie          ☐  District 3 - Rolling Meadows      ☐  District 4 - Maywood
      5600 Old Orchard Rd.            2121 Euclid                          1500 Maybrook Ave.
      Skokie, IL 60077                Rolling Meadows, IL 60008            Maywood, IL 60153

   ☐  District 5 - Bridgeview      ☐  District 6 - Markham             ☐  Child Support
      10220 S. 76th Ave.             16501 S. Kedzie Pkwy.                28 North Clark St., Room 200
      Bridgeview, IL 60455           Markham, IL 60426                    Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

   This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

WITNESS, _____ APR 16 2008 _____,

Atty. No.: __41154__

Name: __Childress Duffy Goldblatt / Christopher Mammel__

Atty. for: __Plaintiff__

Address: __515 N. State Street, Ste. 2200__

City/State/Zip: __Chicago, IL 60610__

Telephone: __312-494-0200__

Service by Facsimile Transmission will be accepted at: _____

APR 16 2008
_____
Clerk of Court
**DOROTHY BROWN**
Date of service CLERK OF CIRCUIT COURT
(To be inserted by officer on copy left with defendant or other person)

(Area Code)  (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

| | | |
|---|---|---|
| 2120 - Served | 2121 - Served | |
| 2220 - Not Served | 2221 - Not Served | |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| **SUMMONS** | **ALIAS - SUMMONS** | **CCG N001-10M-1-07-05 (** ) |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, <u>CHANCERY</u> DIVISION

(Name all parties)

Jeffrey W. Stevenson

v.

J.P. Morgan Retirement Plan Services LLC

No. _____

08CH14177

Sheriff please serve Defendant
J.P. Morgan Retirement Plan Services
by serving its Registered Agent
CT Corporation System
208 South LaSalle St., Ste. 814
Chicago, IL 60604

**SUMMONS**

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

❑ Richard J. Daley Center, 50 W. Washington, Room ___802___, Chicago, Illinois 60602

❑ **District 2 - Skokie**
5600 Old Orchard Rd.
Skokie, IL 60077

❑ **District 3 - Rolling Meadows**
2121 Euclid
Rolling Meadows, IL 60008

❑ **District 4 - Maywood**
1500 Maybrook Ave.
Maywood, IL 60153

❑ **District 5 - Bridgeview**
10220 S. 76th Ave.
Bridgeview, IL 60455

❑ **District 6 - Markham**
16501 S. Kedzie Pkwy.
Markham, IL 60426

❑ **Child Support**
28 North Clark St., Room 200
Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 41154

Name: Childress Duffy Goldblatt / Christopher Mammel

Atty. for: Plaintiff

Address: 515 N. State Street, Ste. 2200

City/State/Zip: Chicago, IL 60610

Telephone: 312-494-0200

Service by Facsimile Transmission will be accepted at: _____

WITNESS, APR 1 6 2008

_____
Clerk of Court

Date of service: APR 1 6 2008
(To be inserted by officer on copy left with defendant or other person)

CIRCUIT COURT

(Area Code)   (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

JEFFREY W. STEVENSON          )
                              )
          Plaintiff,          )
                              )
v.                            )      No. 08CH14177
                              )
J. P. MORGAN RETIREMENT PLAN  )
SERVICES LLC, a Limited Liability )
Company,                      )
                              )
          Defendant.          )

## COMPLAINT FOR DECLARATORY AND OTHER RELIEF

NOW COMES Plaintiff Jeffrey W. Stevenson, an individual, by and through his undersigned attorneys, Childress Duffy Goldblatt, Ltd., and for his Complaint against Defendant J. P. Morgan Retirement Plan Services, LLC states as follows:

### Parties

1.      Jeffrey W. Stevenson is an individual who, at all times relevant, resided in Prospect Heights, Illinois.  As shown more fully hereafter, this action concerns performance and breach of agreements entered into between Stevenson and Defendant related to acquisition in October 2006 of the companies in which Stevenson was a principal.

2.      J. P. Morgan Retirement Plan Services LLC ("RPS") is a limited liability company with offices in Kansas City, Missouri and Chicago, Illinois, among other places.

3. Defendant RPS is a subsidiary of J. P. Morgan Asset Wealth Management, which is part of J. P. Morgan Chase & Co.

### Jurisdiction and Venue

4. This Court has jurisdiction over Defendant because it maintains an office in Chicago and conducts on-going business in Illinois. Additionally, jurisdiction is proper in this Court because RPS entered into a contract with Stevenson in Illinois.

5. Pursuant to the "Non-Competition and Non-Solicitation Agreement," the parties have consented to jurisdiction and venue in any Court located within the State of Illinois. (A true and correct copy of the "Non-Competition and Non-Solicitation Agreement" is attached hereto as Exhibit A, hereinafter referred to as the "Employment Agreement.")

6. Venue is proper in this Court because Stevenson worked out of Defendant's Chicago office and the contract at issue was formed and performed in Chicago.

### Common Facts

### Plaintiff's Role and Duties Prior to the Acquisition

7. Stevenson is licensed in Illinois as a lawyer and is an Enrolled Actuary under Federal law.

8. In 1999, Stevenson joined Chicago Consulting Actuaries, a 40 person actuarial consulting firm with one office in Chicago. Chicago Consulting Actuaries subsequently changed its name to CCA Strategies LLC (hereafter "CCA").

2

9. By the time of the sale to RPS in 2006, CCA had over 200 employees and ten offices in the United States, and had recently established an office in Bangalore, India (for which Stevenson served as a director along with another CCA Managing Director). CCA had 40 individuals who were members (also referred to as "owners" or "principals") of the firm. Stevenson was a member of CCA and owned approximately 15% of CCA at the time of the acquisition.

10. At CCA, Stevenson served on the four member Executive Committee and was actively involved in broad firm leadership issues. The Executive Committee also served as the firm's compensation committee and approved all firm compensation issues.

11. Stevenson played an active role in establishing CCA's new offices. This included the recruiting and mentoring of the people leading those offices, as well as new business opportunities for those offices.

12. Stevenson was also involved at CCA in generating new business opportunities, both within the High Income Deferral practice and for other practice areas. Stevenson worked closely with many principals and employees at CCA in this respect.

13. CCA had numerous relationships with third parties, and part of CCA's strategy for growth was to build on these relationships. Stevenson was actively involved with many of these partners. One such relationship was a quasi-joint venture with Citistreet whereby Citistreet and a number of other organizations, including CCA, formed an affiliation called Citistreet Consulting Services. CCA

was the actuarial and consulting arm of this venture. Stevenson was centrally involved in formulating the agreement under which CCA operated with Citistreet and served with the other members of the CCA Executive Committee on the Citistreet Advisory board. This board generally met quarterly to discuss strategic issues and opportunities.

14. Stevenson oversaw most of the legal issues and maintained all of CCA's relationships with outside counsel. When CCA initiated its first lawsuit against a former member for breach of various agreements and covenants, Stevenson worked with outside counsel and led the litigation effort. Stevenson worked with outside counsel on maintaining the various organizational documents (*e.g.,* Operating Agreement).

15. Stevenson was the leader of CCA's merger and acquisition practice area, and was a primary liaison with CCA's law firm clients for new business opportunities (*e.g.,* litigation support, M&A opportunities and general consulting assistance). During 2006, CCA completed its first acquisition, of Alfred W. Hayes Company in St Louis, and Stevenson led the legal efforts for this transaction.

### High Income Deferral Segment

16. In the late 1990's Congress changed the tax laws in a way that eventually lead to the creation of the High Income Deferral practice. Stevenson was one of the pioneers in recognizing and developing the ability to use a defined benefit pension plan in ways that would allow significant tax-deductible income deferrals for business owners, and in particular, partners of major law firms.

4

17. CCA did not do any significant consulting in the "tax-focused" market, or in the large law-firm market that Stevenson was interested in developing. Accordingly, Stevenson started from scratch building this practice, which became known in the industry as the "Partner Parity Plan" business ("Parity").

18. Over the following few years, Stevenson was able to develop the leading practice in this country that focused on major law firms. This practice grew to represent nearly 30% of the firms in the AmLaw 100, and approximately 60 firms overall. The income deferrals made by the partners/owners who had established a Parity plan with CCA were approaching $2 billion by the end of 2007.

19. The concepts that made the Parity plan attractive to partners of major professional service firms were also applicable to executives in large corporations. Stevenson determined that the High Income Deferral opportunity could apply to large corporations in a very meaningful way and created what became referred to within CCA as the Qmax Program ("Qmax"). Stevenson implemented the approach at a number of firms on a small scale, and then through a joint marketing agreement CCA entered into with Bank of America (which Stevenson organized), CCA was retained by a large international technology company who eventually implemented the strategy and funded over $200 million of executive nonqualified deferrals.

20. This High Income Deferral design was also attractive for smaller firms. The problem with the small firm market was that the design approach used with a typical Parity assignment was expensive and high-touch, which made distribution

5

on a large scale difficult. However, Stevenson believed that these obstacles could be overcome through technology and partnerships with financial advisors and institutions. In early 2004, CCA authorized Stevenson and his team to develop this concept further and they launched efforts to build an automated system that would streamline the process and make the small company market an attractive strategy to pursue.

21. Because this endeavor would be a technology driven business, CCA decided to establish the business in a new entity, CCA Small Business Group LLC ("SBG").

22. Stevenson held the position of President of SBG (in addition to his duties within CCA). Stevenson owned approximately 20% of the business. The remaining ownership was by other CCA members and employees, either through direct ownership or indirectly through their ownership in CCA.

23. SBG had its first product launch in December 2004 with "MyMax." MyMax was the first fully-automated defined benefit plan module that allowed a person (or their financial advisor) to model, design and establish an individual defined benefit plan all on-line and in real time. The product was only for business owners who were sole proprietors. What once took weeks to complete could now be done in mere minutes on-line. The second product, OurMax, was launched in 2005. OurMax automated the design process applicable to High Income Deferral plans, and made such plans available to smaller firms.

24.    Stevenson and his team worked to forge relationships with several financial institutions as distribution partners for the MaxPlans, and supported a network of independent registered investment advisors ("RIA"). Although SBG was still in its infancy stage, it was having success in the market place and was quickly becoming recognized as the leader in this High Income Deferral market.

25.    All of the employees/members who worked on a High Income Deferral assignment (whether a Parity, Qmax or SBG project) were employed by CCA. SBG would use those CCA employees as it needed, and CCA would charge SBG for a portion of the employee's cost. A group of employees, primarily developers and administrative persons (non-actuaries) involved with SBG, were leased "full-time" from CCA.

### Merger Facts

26.    RPS first approached CCA in October 2005, seeking to meet and discuss possible business opportunities.

27.    The Executive Committee (including Stevenson) met with Tom Kmak (founder and CEO of RPS) and Pam Popp in December, 2005, to discuss various options, at which time Kmak and Popp indicated RPS's desire to buy CCA and SBG.

28.    Stevenson, along with another CCA member, led the JPMorgan transaction activities. During the summer/fall of 2006 most of Stevenson's time was devoted to finalizing and closing this transaction.

29.    As part of the JPMorgan merger, Stevenson was appointed by the 40 CCA members as the Holder Representative, which means Stevenson represents all

7

members in any dispute that arises with JPMorgan under the merger documents.

30. RPS bought CCA and SBG on October 2, 2006 ("Closing Date"). The acquisition was a merger, whereby CCA was merged into CCA Acquisition LLC and SBG was merged into SBG Acquisition LLC, both of which entities were wholly owned by RPS. The names of each acquisition entity was renamed (to CCA and SBG respectively) after the transaction. As a condition of the merger, Stevenson, along with four other Senior Executives of CCA, were required to execute a Non-Competition and Non-Solicitation Agreement. They were also assured continuation of their strategic and leadership roles and compensation levels immediately prior to the acquisition in the acquired companies. *See* Ex. A, ¶ 12(a)(no termination without "Just Cause" and termination by Executive for "Good Reason" continues compensation during restrictive periods).

### *Stevenson was promised, then denied a position as CEO*

31. In or around late November 2006, Stevenson met with Kmak and was told that the merged RPS/CCA business would be restructured into three component parts: First, the primary RPS 401k business would be combined with the CCA Defined Benefits administration business. This would be referred to as the "Institutional" or "TBO" group and the leader of this group would be appointed soon. Second, the High Income Deferral line of business that Stevenson had created would be combined with the small 401k business from RPS, and this group would be referred to as "Emerging Markets." Kmak indicated that Stevenson would be the CEO of this business. Finally, the remaining pieces of CCA would be in a third

business line called "Consulting," with the former President from CCA as the CEO. Each of these businesses would report up to Kmak, who would be the CEO of RPS. Stevenson would serve on the Executive Committee of RPS (along with other senior people from RPS and CCA).

32.    The position of CEO of the Emerging Markets group and member of the combined RPS/CCA Executive Committee was consistent with Stevenson's role and position prior to the merger.  Stevenson had been President of SBG, which would become a central part of the Emerging Markets group, and he had been a managing director and Executive Committee member for CCA, the bulk of which would become the Consulting group.  Thus, the position Kmak promised to Stevenson was consistent with his responsibilities prior to the merger.  He would continue to build and lead the High Income Deferral practice while being involved in the formulation of overall strategy of the combined firm.  Moreover, combining RPS' small 401k line of business under Stevenson's High Income Deferral business was consistent with the long-term strategy to use a defined contribution recordkeeping platform as the platform for the High Income Deferral plans.

33.    December 20, 2006, Kmak told Stevenson that the positions heading up the three new units would not be CEO titles, but would instead be COO titles. Also, he informed Stevenson that Popp would be the COO of Emerging Markets and that Stevenson would report to her with the title of Managing Director.  However, Kmak assured Stevenson that (1) he would be a partner with Popp so he would remain peer-to-peer organizationally, (2) he would maintain his role on the Executive

9

Committee of RPS (along with other senior people from RPS and CCA), the combined organization, and (3) he would continue to be a critical person in developing the strategies to build the entire RPS/CCA business.

34. In an email on January 6, 2007, Kmak announced the new structure and leadership team for RPS. (A true and correct copy of the email is attached hereto as Exhibit B.)

35. Because of other decisions made by Defendant, as alleged hereafter, Stevenson was never permitted to assume the responsibilities of an officer overseeing the Emerging Markets group or of the combined RPS/CCA business.

### Consulting Group Split from the Rest of RPS

36. At some point in December 2006, Eve Guernsey, CEO of the Americas Division for J. P. Morgan Chase, decided that the Consulting group would be separated from the other groups within RPS. Guernsey decided that the Consulting group would not report to Kmak and would instead report directly to her. Stevenson's discussion with Kmak on December 20 was not consistent with the changes dictated by Guernsey and Stevenson was not informed of those changes. Stevenson had not been involved in the discussions concerning the separation of the Consulting practice.

37. Based on the structure announced to Stevenson by Kmak, he would continue to work with his former partners in CCA in setting the strategic decisions for the newly created Consulting group. However, following Guernsey's changes, Stevenson's position with the Emerging Markets group became entirely separated

10

from the Consulting group.

38. Additionally, the Consulting group formed a separate senior leadership team which did not include Stevenson.

39. Because of the separation between the Consulting group and the other RPS groups, Stevenson was no longer allowed to work with his former partners from CCA and was not involved in business activities that pertained to the Consulting group shortly after the merger.

40. The decision to separate the Consulting group from Emerging Markets prevented Stevenson from fulfilling his duties as an executive with the CCA/Consulting group.

41. The split of the Consulting group also caused confusion for the employees working on High Income Deferral projects, including confusion around who actually supervised these employees. Because of the internal conflict that existed between RPS and Consulting, a hostile environment formed, which made coordination of efforts difficult. Most of the actuaries and consultants that managed the Parity line of business were still "employed" within the Consulting groups, even though that business was in the Emerging Markets line of business (under RPS). During the summer of 2007 Guernsey made the decision that the Parity actuaries/consultants could move to Emerging Markets. However, Emerging Markets would need to post for the positions, and those employed in the Consulting group would need to apply for such positions. Emerging Markets posted for 18 positions and every employee that Emerging Markets had targeted elected to apply and eventually became

11

employees of Emerging Market.  This separation finally resulted in elimination of Stevenson's Executive role within RPS in connection with the Consulting groups.

### *Kmak Leaves RPS and Popp Takes Charge*

42.  In August 2007, Kmak announced that he was leaving RPS and that Guernsey would be acting CEO of RPS.  Shortly thereafter, Popp notified Stevenson that Guernsey had established a new Executive Committee that excluded Stevenson.

43.  Earlier, after Popp had been installed to head the Emerging Markets group instead of Stevenson, Kmak had indicated to Stevenson that Kmak considered him essentially peer-to-peer with Popp.  However, with Kmak gone, Popp no longer was required to treat Stevenson as an equal.

44.  By September, 2007 it was clear that Popp wanted Stevenson to fill a subordinate position equal to that held by Jeff Kargl, who acted merely as a manager of his respective line of business.  Kargl was in charge of the defined contribution line of business within Emerging Markets.  Popp indicated that Stevenson would take on administrative and managerial duties of supervising employees, budget, and day-to-day operations.  Stevenson's authority within the High Income Deferral market was significantly diminished, and his authority within consulting was eliminated.

45.  Popp had assumed Stevenson's duties for the businesses he created and built.  Stevenson's role then had to be reduced to become merely administrative and managerial, a role that he did not perform previously.  Stevenson's responsibilities

became equal to that of Kargl, a Vice President and manager in a position compensated at less than half of the amount Stevenson historically made. Stevenson no longer had strategic responsibilities.

46. Popp realized that Stevenson was not satisfied with the role she had crafted for him and the reduction in responsibilities. Popp came to Chicago to see what could be worked out to restore some of Stevenson's responsibility and duties, and stated that she was open to crafting a new position. But she stated that in order to do so Stevenson would have to take a substantial pay cut to come more in line with the position level.

47. In the fall of 2007 Popp had been holding back announcement of the Emerging Markets organization chart because Popp was concerned that Stevenson might resign as a result of the material diminution in his authority and position. Stevenson agreed with Popp that it would be harmful to the team if an organization chart was announced with Stevenson as the leader and then shortly thereafter it had to be revised. Thus Stevenson was pressured to finalize his decision on whether to accept the diminished position or leave the company.

48. Stevenson was not willing to accept the reduced position, but agreed with Popp that it would be best for JPMorgan's interests to complete the reorganization decisions expeditiously, announce his departure as a retirement, and then unveil the new team structure as soon as possible. Popp stated that she didn't want to convey any type of message that RPS was forcing Stevenson out, though the only position available for him was not equivalent to the duties or responsibilities of his

13

prior positions.

49.    Popp also was anxious for Stevenson to provide formal notice of his departure so that she could remove him from the budget for 2008. Removal of Stevenson's position eliminated a considerable expense in Popp's budget for the Emerging Markets team.

50.    Stevenson reluctantly submitted a resignation document designed to preserve his rights to promised compensation for the sale of his stake in the business, and was not required by JPMorgan to execute any separation agreement, release or other legal documents waiving his contractual rights under the terms of the sale or his employment.  Stevenson's last day of employment with Defendant was December 3, 2007.

**Count I**
**Breach of Contract**

51.    Paragraphs 1-50 of this Complaint are incorporated herein as paragraph 51 of Count I as though fully restated.

52.    Stevenson and Defendant entered into the Employment Agreement. *See* Ex. A. The Parties executed the Employment Agreement on September 12, 2006.

53.    The Employment Agreement provides, *inter alia*, restrictive covenants prohibiting competition, solicitation of customers and solicitation of employees by Stevenson under certain circumstances.

54.    The Employment Agreement provides that Stevenson shall be compensated during the Non-Competition Period (defined in the contract as three years from the closing date of the merger) if Stevenson is terminated other than for

14

"Just Cause" or if Stevenson terminates his employment for "Good Reason," as defined in the contract.

55.    As alleged *supra*, Defendant created circumstances that constituted "Good Reason."

56.    Stevenson agreed to terminate his employment for Good Reason because of the material diminution of his duties and interference with his carrying out of his duties and because he was unable to carry out his duties.

57.    Defendant has not paid the compensation owed to Stevenson under the Employment Agreement.

58.    Defendant is in breach of the Employment Agreement, which has directly caused Stevenson damages based on the amounts to which he is entitled under the contract.

WHEREFORE, Plaintiff asks this Court to enter a judgment against the Defendant granting the following relief:

a)    Damages under the Employment Agreement in the form of unpaid compensation, including salary and bonuses, as provided for in the contract, in an amount to be proved at trial in excess of $50,000;

b)    Damages under the Employment Agreement for retirement, health and income protection benefits as provided for in the contract;

c)    Damages under the Employment Agreement for the "Earn-Out" bonus as provided for under Annex H of the Purchase Agreement and referred to in the Employment Agreement; and

15

d) Any other relief as this Court deems equitable and fair.

## Count II
## Declaratory Judgment

59.　Paragraphs 1-50 of this Complaint are incorporated herein as paragraph 59 of Count II as though fully restated.

60.　Count II is plead in the alternative to Count I.

61.　Defendant is in material breach of the Employment Agreement.

62.　The Employment Agreement purports to provide restrictive covenants requiring non-competition, non-solicitation of customers and non-solicitation of employees by Stevenson in the event of termination of his employment.

63.　The Employment Agreement places undue burdens on Stevenson's ability to pursue his line of work.

64.　Stevenson faces immediate damages from his continued efforts to avoid any violation of the restrictive covenants, though Defendant has refused to perform its obligations under the Employment Agreement in light of termination for "Good Reason".

WHEREFORE, Plaintiff asks this Court to enter a judgment against the Defendant granting the following relief:

a) A declaratory judgment that Defendant has materially breached the provisions of the Employment Agreement;

b) A declaratory judgment further determining that the restrictive covenants in the Employment Agreement are unenforceable due to Defendant's material breach; and

c)  Any other relief as this Court deems equitable and fair.

### Count III
### Illinois Wage Payment Collection Act
### (820 ILCS 115/1 et seq.)

65.    Paragraphs 1-50 of this Complaint are incorporated herein as paragraph 65 of Count III as though fully restated.

66.    Stevenson was an employee of the Defendant.

67.    Under the Employment Agreement, Stevenson is owed final compensation during the non-compete period.

68.    Defendant, being able to pay the final compensation, willfully refuses to pay after demand.

69.    Defendant is in violation of the Illinois Wage Payment and Collection Act.

WHEREFORE, Plaintiff asks this Court to enter a judgment against the Defendant granting the following relief:

a)  Judgment for damages owed to the Plaintiff for unpaid final compensation, as provided for in the Employment Agreement, in an amount to be proved at trial in excess of $50,000;

b)  Judgment for damages owed to the Plaintiff for unpaid "Earn-Out" bonus as provided for under the Purchase Agreement and referred to in the Employment Agreement;

c)  Interest on the amount of the unpaid final compensation; and

d)  Any other relief as this Court deems equitable and fair.

## Count IV
## Illinois Attorneys Fees in Wage Actions Act
### (225 ILCS 225/1)

70. Paragraphs 1-50 of this Complaint are incorporated herein as paragraph 70 of Count IV as though fully restated.

71. Stevenson issued a written demand to Defendant at least 3 days before this action was brought. (A true and correct copy of the written demand is attached hereto as Exhibit C.)

72. The written demand stated a sum certain of wages owed to Stevenson in minimum amount of $107,884.60 due and owing.

73. The amount of wages stated is earned and due and owing under the Employment Agreement, and this action was brought to establish the amount is justly due and owing.

WHEREFORE, Plaintiff asks this Court to enter a judgment against the Defendant granting the following relief:

a) Allow Plaintiff a reasonable attorneys' fee to be taxed as costs of the action;

b) Judgment for the full amount of wages found due and owing under the Agreement at the time of judgment; and

c) Any other relief as this Court deems equitable and fair.

Respectfully submitted,

By: _____

One of Plaintiff's Attorneys

Christopher N. Mammel
Adam J. Betzen
Childress Duffy Goldblatt, Ltd.
515 North State Street, Suite 2200
Chicago, Illinois 60610
(312) 494-0200
Atty No. 41154

## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

AGREEMENT, made and entered into as of the 12th day of September, 2006, by and between J. P. Morgan Retirement Plan Services LLC (the "Purchaser"), and Jeffery Stevenson (the "Executive").

### W I T N E S S E T H:

WHEREAS, the Executive currently serves as Principal for CCA Strategies LLC (the "Company"); and

WHEREAS, pursuant to a Merger Agreement dated as of September 5, 2006 (the "Merger Agreement") by and among the Purchaser and Company, Company will become a wholly-owned subsidiary of Purchaser; and

WHEREAS, the Purchaser and the Executive have entered into a letter agreement for employment (the "Offer Letter"), to be effective upon the Closing Date of the transactions contemplated by the Merger Agreement; and

WHEREAS, in order to protect the goodwill interests being acquired by the Purchaser under the Merger Agreement, the Purchaser desires to enter into an agreement regarding the Executive's competitive activities following the termination of his employment with the Purchaser (this "Agreement"); and

WHEREAS, the execution of this Agreement is an essential part of the Merger Agreement, and Executive has agreed to execute and be bound by this Agreement in order to induce the Purchaser to enter into the Merger Agreement and to perform the transactions contemplated thereby; and

WHEREAS, delivery of this Agreement is a condition to the obligations of the Purchaser under the Merger Agreement; and

WHEREAS, the Executive acknowledges that during his employment by Purchaser he may be bound by such non-competition, non-solicitation and confidentiality agreements and restrictions as are applicable to similarly-situated officers of Purchaser.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged, the Purchaser and the Executive (individually, a "Party" and collectively, the "Parties") agree as follows:

9. Definitions.

Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Merger Agreement. Additional defined terms may be included elsewhere in this Agreement.

**EXHIBIT**

A

10. Effective Date.

This Agreement shall be effective upon the Closing Date of the transactions contemplated by the Merger Agreement (the "Effective Date"). If the Closing Date does not occur, this Agreement shall be void *ab initio* and shall be of no further force and effect.

11. Compliance with JPMorgan Chase & Co.'s Code of Conduct.

The Executive acknowledges that he has been provided with a copy of the JPMorgan Chase & Co. Code of Conduct, as such rules are in writing and in effect and amended from time to time (the "Code of Conduct"), and he covenants that he will complete the required certification of his receipt of and affirmation of the Code of Conduct prior to the commencement of his employment with the Purchaser. The Purchaser agrees that any amendment or change to the Code of Conduct that applies to the Executive shall apply to all similarly-situated employees of JPMorgan Chase & Co. To the extent that any provision of this Agreement limits or is limited by, qualifies or is qualified by, or conflicts with any provision of the Code of Conduct, the provision of this Agreement shall control.

12. Restrictive Covenants.

(a)     Non-Competition.  The Executive agrees that for three years from the Closing Date (the "Non-Competition Period"), he shall not at any time, without the prior written consent of the Purchaser, directly or indirectly, whether for his own account or as a shareholder, partner, joint venturer, employee, consultant, lender, advisor, and/or agent, of any person, firm, corporation, or other entity:

(i)      engage in activities or businesses that are in competition with the services, products and businesses of the Purchaser ("Competitive Activities"), including without limitation (A) being employed by or otherwise providing services to an actuarial consulting firm or benefit outsourcing firm, engaging in actuarial consulting or providing benefits administration services, including without limitation the offering of defined contribution plan record keeping and defined benefit administration, such services being provided on a stand-alone basis or bundled with investment products or services provided by others, or (B) assisting any person or entity in any way to do, or attempt to do, anything prohibited by clause (A) above; provided, that ownership of less than 2% of the outstanding stock of any publicly traded corporation shall not be deemed to be engaging solely by reason thereof in any of its businesses; or

(ii)     establish any new business that engages in Competitive Activities.

Nothing herein shall preclude the Executive from (i) serving as a director of outside boards of directors for entities unrelated to the business of the Purchaser, (ii) serving on the board of directors of trade organizations or associations related to the business of the Purchaser, (iii) engaging in charitable activities and community affairs,

(iv) managing his personal and family investments and affairs, so long as such board memberships and other activities do not materially interfere with the performance of his duties for the Purchaser and do not involve activities which are competitive with respect to the Purchaser or (v) providing services directly to an entity for which Executive is an employee, such services not being offered to any other entity.

If Purchaser terminates Executive's employment other than for Just Cause (as defined in the Offer Letter) or Executive terminates his employment for Good Reason (as defined below), for the remaining duration of the Non-Competition Period, Purchaser shall continue to pay Executive his base salary as in effect on the date his employment terminates and a bonus equal to the last annual incentive award Purchaser paid Executive. In addition, Executive shall be entitled to receive his proportionate share of the 90% Pool under Annex H of the Purchase Agreement. During the Non-Competition Period, Executive shall be eligible to receive health and income protection benefits (as provided under employee benefit plans sponsored by JPMorgan Chase & Co.) on the same basis as if he were receiving benefits under the JPMorgan Chase Severance Pay Plan or any successor plan (the "Severance Plan"). All amounts payable under this paragraph shall be offset by any severance pay amounts Executive receives during the Non-Competition Period under the Severance Plan. Purchaser shall have the right, in its sole discretion, to reduce or eliminate the Non-Competition Period by written notice to Executive.

For purposes of this Agreement, "Good Reason" shall mean: (i) a reduction in Executive's base salary or denial of bonus without the Executive's prior written consent, (ii) a material breach of this Agreement, the Offer Letter or the Merger Agreement by Purchaser, (iii) a material diminution in the Executive's duties or interference with the Executive's carrying out his duties so that he is unable to carry out his duties, or (iv) the relocation of the Executive's principal place of business by more than 25 miles from the Chicagoland area without the Executive's prior written consent. A change in title, reporting relationship or number of employee reports shall not constitute a material diminution of duties or interference with Executives duties for purposes of (iii) above.

(b)    Non-Solicitation of Customers. The Executive agrees that for the longer of (i) three years after the Closing Date under the Merger Agreement and (ii) one year after the Executive's employment with Purchaser terminates for any reason (the "Non-Solicitation Period"), he will not, without the Purchaser's prior written consent, directly or indirectly, whether for his own account or as a shareholder, partner, joint venturer, employee, consultant, lender, advisor, and/or agent of any person, firm, corporation, or other entity, solicit, contact or do business with any customer of the Purchaser or, any prospective customer of the Purchaser that has been contacted by the Purchaser, to purchase any goods or services of the type provided by the Purchaser. For purposes of this Section 4(b), the applicable customers are those who are customers of Purchaser at during the Non-Solicitation Period and/or who were customers of Purchaser within the twelve months preceding the Executive's termination.

(c)    Non-Solicitation of Employees. The Executive also covenants and agrees that for the longer of (i) three years after the Closing Date under the Merger Agreement and (ii) one year after the Executive's employment with Purchaser terminates for any reason, he shall not, without the Purchaser's prior written consent, directly or indirectly,

whether for his own account or as a shareholder, partner, joint venturer, employee, consultant, lender, advisor, and/or agent, of any person, firm, corporation, or other entity, solicit, recruit, hire or induce to leave employment any employee of the Purchaser who is then or has within the previous twelve months been, an employee of JPMorgan Chase & Co. or any of its subsidiaries or affiliates.

(d)     The Executive acknowledges that the time limitations set forth in this Agreement are reasonable and properly required for the adequate protection of the business and goodwill purchased by Purchasers under the Merger Agreement. In the event any such time limitation is deemed to be unreasonable by any court of competent jurisdiction, the Executive agrees to the reduction of such time limitation to such period which such court shall deem reasonable. The Executive further agrees and acknowledges that Purchaser provides services to customers throughout the United States and that therefore application of the Executive's obligations contained herein throughout the United States it reasonable.

5.     Injunction.

Each party hereto acknowledges, consents and agrees that this Agreement is an essential part of the Merger Agreement and constitutes a material inducement to Purchaser's entering into and performing its obligations under the Merger Agreement. Each party hereto agrees that if the Executive breaches or attempts to breach or otherwise violate any of the provisions hereof, the Purchaser would suffer irreparable harm and continuing damage. Accordingly, in addition to any other remedies that the Purchaser may have under this Agreement or otherwise, the Purchaser shall be entitled to apply to any court of competent jurisdiction for specific performance, an injunction, or other equitable relief in order to restrain the Executive from committing or continuing any breach or violation of this Agreement without the necessity of proving actual damages or posting a bond or other security. Nothing in this Agreement shall be construed as prohibiting the Purchaser from pursuing any other remedy or remedies, including, without limitation, the recovery of damages.

6.     Representation.

The Executive represents and warrants that no agreement exists between him and any other person, firm or organization that would be violated by the performance of his obligations under this Agreement.

7.     Entire Agreement.

This Agreement, the Offer Letter and the Merger Agreement contain the entire understanding and agreement between the Parties concerning the subject matter hereof and, subject to the occurrence of the Effective Date, supersedes all prior agreements, understandings, discussions, negotiations and undertakings, whether written or oral, between the Parties with respect thereto.

8.     Amendment or Waiver.

No provision in this Agreement may be amended unless such amendment is agreed to in writing and signed by the Executive and an authorized officer of the Purchaser. Except as specifically provided herein, no waiver by any Party of any breach by another Party of any condition or provision contained in this Agreement to be performed by such other Party shall be deemed a waiver of a similar or dissimilar condition or provision at the same or any prior or subsequent time. Except as specifically provided herein, any waiver must be in writing and signed by the Executive and an authorized officer of the Purchaser.

9     Severability; Savings Clause.

In the event that any provision or portion of this Agreement shall be determined to be invalid or unenforceable for any reason, in whole or in part, the remaining provisions of this Agreement shall be unaffected thereby and shall remain in full force and effect to the fullest extent permitted by law. With respect to any provision of this Agreement finally determined by a court of competent jurisdiction to be unenforceable, the Executive and the Purchaser hereby agree that such court shall have jurisdiction to reform this Agreement or any provision hereof so that it is enforceable to the maximum extent permitted by law, and the parties agree to abide by such court's determination. If any of the covenants of this Agreement is determined to be wholly or partially unenforceable in any jurisdiction, such determination shall not be a bar to or in any way diminish the rights of the Purchaser or its affiliates to enforce any such covenant in any other jurisdiction.

10.     Governing Law/Jurisdiction.

This Agreement shall be governed by and construed in all respects under the laws of the State of Illinois without reference to its conflicts of laws rules or principles that would apply the laws of another jurisdiction. Any suit, action, proceedings or litigation arising out of or relating to this Agreement shall be brought and prosecuted only in such federal or state court or courts located within the State of Illinois as provided by law. The parties hereby irrevocably and unconditionally consent to the jurisdiction of each such court or courts located within the State of Illinois, and to service of process by registered or certified mail, return receipt requested, or by any other manner provided by applicable law, and hereby irrevocably and unconditionally waive any right to claim that any suit, action, proceeding or litigation so commenced has been commenced in an inconvenient forum.

11.     Waiver of Jury Trial.

The parties hereby irrevocably waive, to the fullest extent permitted by law, all rights to trial by jury in any action, proceeding, claim or counterclaim (whether based upon contract, tort or otherwise) arising out of or relating to this Agreement or any of the transactions contemplated hereby.

12.   Notices.

Except as specifically provided otherwise herein, all notices, requests, demands and other communications hereunder shall be in writing and shall be deemed effective (A) when delivered personally, (B) when sent by confirmed facsimile, (C) one (1) Business Day after deposit with a commercial overnight carrier with written verification of receipt, or (D) 5 days after deposit in the United States mail by certified mail postage prepaid. All communications will be sent to the party to whom it is directed at the address set forth below:

If to Executive:


Jeffery Stevenson
216 South Jefferson Street Suite 600
Chicago, IL 60661


If to the Purchaser:


J.P. Morgan Retirement Services, LLC.
Attention: Thomas Kmak
9300 Ward Parkway
Kansas City, MO 64114


13.   Counterparts.

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but both of which taken together shall constitute one and the same agreement and each of which may be delivered by facsimile transmission.


IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.


J.P. Morgan Retirement Services, LLC.


By:   _Thomas R. Kmak_
      Thomas R Kmak
      Chief Executive Officer

Jeffery Stevenson
Managing Director

## JPMorgan ●
**Asset Management**

**Thomas R Kmak**
Managing Director
RPS Executive

September 5, 2006

*Mr. Jeffery Stevenson*
216 South Jefferson Street  Suite 600
Chicago IL 60661

Dear Jeff:

Subject to the closing of the transactions contemplated under the merger agreement between JPMorgan Retirement Plan Services LLC and CCA Strategies LLC, you will become an employee of JPMorgan Chase or one of its subsidiaries effective as of the closing date of the foregoing transaction (the "Closing Date"), pursuant to the terms and conditions of this letter agreement (the "Agreement").

### Title
You will be employed as a Managing Director of JPMorgan Retirement Plan Services LLC.

### COMPENSATION
#### Salary
Your annualized base salary as of the Closing Date will be $330,000 (less applicable tax withholdings and deductions), earned and payable semi-monthly in accordance with JPMorgan Chase policies.

#### 2006 Incentive Compensation
You will be eligible for an incentive award of $36,000, less applicable deductions, for the fourth quarter of the 2006 performance year subject to the requirement that you be actively employed at the time of payout. This incentive award will be paid in cash in January 2007.

#### 2007 Incentive Compensation
For performance year 2007 (payable in January 2008), you will be eligible for a year end incentive award of $144,000. You must be actively employed at the time of payout to be eligible for this award, except as otherwise provided below. This award will be subject to the applicable withholdings and the cash/stock table in place for the business at the time of payout. The table below is the current year cash/stock table which is subject to change for performance year 2007.

#### Current Year PY2006 Cash/Stock Table

| Total Incentive Award | Cash % | RSU % |
|---|---|---|
| Less than $20,000 | 100% | 0% |
| $20,000 - $100,000 | 90% | 10% |
| $100,001 - $200,000 | 80% | 20% |
| $200,001 - $500,000 | 75% | 25% |
| $500,001 - $750,000 | 70% | 30% |
| >$750,000 and All Managing Directors | 65% | 35% |

Notwithstanding the discretionary nature of the firm's incentive awards, but otherwise subject to the terms of the eligible Incentive Plan (except as otherwise provided herein with respect to your 2007 guaranteed bonus), including the requirement that you be actively employed at the time of payout except as otherwise provided herein, you have chosen to defer 90% of the cash portion of your performance year 2007 incentive award. This deferred cash bonus will be payable to you beginning in the calendar year following the year of termination of your employment (including Death) in 15 annual installments, subject to being paid as a lump sum as provided

JPM Retirement Plan Services LLC -  9300 Ward Parkway, Floor 1, Kansas City, MO 64114-3317
Telephone 816-340-4424 - Facsimile 816-340-3430
thomas.r.kmak@jpmorgan.com

1

for by the terms of the JPMorgan Chase Deferred Compensation Program ("Program") if your employment terminates for reason other than Total Disability, Job Elimination or Retirement as defined by the Program. Your deferred compensation will be subject to the investment experience of the hypothetical investment choices provided for, from time to time, by the JPMorgan Chase Deferred Compensation Program. You further acknowledge the deferrals are subject to the rules of, and taxation under, Section 409A of the Internal Revenue Code.

## Termination for Just Cause

If you are terminated for Just Cause as defined below, or if you resign from JPMorgan Chase, you will no longer be eligible for any outstanding amounts of the 2006 or 2007 incentive compensation awards referenced above. For the purposes of this letter, "Just Cause" means a determination by JPMorgan Chase that your employment terminated as a result of your (i) violation of any law, rule or regulation (including rules of self-regulatory bodies) to which JPMorgan Chase or you are subject; (ii) indictment or conviction of a felony; (iii) commission of a fraudulent act; (iv) misconduct related to your duties to JPMorgan Chase; (v) failure to perform satisfactorily the duties associated with your job function as directed by your manager, or to follow reasonable directives of your manager, provided however, that to the extent such failure to perform your duties is capable of remedy, JPMorgan Chase will provide you with written notice and give you an opportunity to cure within thirty (30) days; (vi) violation of the JPMorgan Chase Code of Conduct or other JPMorgan Chase policies (other than an immaterial and inadvertent violation); or (vii) any act or failure to act that is or would reasonably be expected to be injurious to the interests of JPMorgan Chase or its relationship with a customer, client or employee.

## In The Event Of A Position Elimination

In the event that your employment terminates due to a position elimination under circumstances making you eligible for benefits under the JPMorgan Chase Severance Pay Plan, the following terms will apply, subject to your execution of a general release of claims in a form acceptable to JPMorgan Chase:

Salary:
You will be paid your base salary through the date your employment terminates.  You will be eligible for benefits under the JPMC Severance Pay Plan, subject to the terms of the plan as in effect at the time your employment terminates.

Incentive Awards for Performance Years 2006 and 2007:
You will remain eligible to receive the 2006 and 2007 incentive awards referred to above.

## Other Conditions of Employment

Your employment will be subject to satisfactory completion of pre-employment processing (including, but not limited to, fingerprinting, drug testing and background checks) and compliance with all applicable JPMorgan Chase policies and procedures including, but not limited to, the JP Morgan Chase Code of Conduct, JPMorgan Chase's Human Resources policies (including, without limitation, the anti-discrimination and anti-harassment policies, as well as the provisions related to outside activities).  Your employment will be on an at-will basis, which means either you or the JPMorgan Chase can terminate your employment at any time, for any or no reason.

As a condition of the merger agreement with CCA Strategies LLC, and therefore as a condition of your employment with JPMorgan Chase, you will be required to sign and abide by an agreement containing restrictive covenants limiting your ability to compete with JPMorgan Chase and to solicit its customers and employees.

We request that you maintain confidentiality as to all aspects of this arrangement, including but not limited to, the existence and amount of the payments above except, as necessary for discussions with your lawyer, tax advisor, accountant or spouse.

If you have any questions, please contact me at the telephone number listed above.

To acknowledge your understanding of and agreement with the terms set forth herein, please sign and date the second original of this letter and return it to my attention.

Sincerely,

Thomas Kmak
Managing Director

Accepted and Agreed:

By:

Printed Name: Jeffery Stevenson


Date:  9/21/2006

JPM Retirement Plan Services LLC · 9300 Ward Parkway, Floor 1, Kansas City, MO 64114-3317
Telephone 816-340-4424 · Facsimile 816-340-3430
thomas.r.kmak@jpmorgan.com

**From:** thomas.r.kmak@jpmorgan.com [mailto:thomas.r.kmak@jpmorgan.com]
**Sent:** Sat 1/6/2007 12:09 PM
**To:** daniel.j.otoole@jpmorgan.com; david.w.embry@jpmorgan.com; pamela.a.popp@jpmorgan.com; Jeff Stevenson
**Subject:** Good Morning...

As you all know from various discussions, a new structure is probably going to be introduced in the somewhat near future. Along with me, the four of you (Dan O'Toole, David Embry, Pam Popp and Jeff Stevenson) will form the core of a new management team that will run the administration businesses for the foreseeable future. Those two business are now referred to as RPS and Emerging.

As we both know, however, we are short two major acquisitions to make sure our long term strategy is viable. The first of these is a TBO firm and the other is for DC scale. Related to that, while we have made solid progress on the CCA acquisition per the project plans, the research I did from successful acquisitions shows that we could have done better. Thus, since acquisitions are in our future, I am forwarding to you those articles I found most interesting. When you have a couple hours of extra time on your hands, read through these carefully and jot down some notes.

So...happy reading and I will send you some other summary thoughts I had on this subject next Saturday (consider them Cliff Notes for debate but I do not want you to have them until you have formed your own opinions). My next todo on this would be to find a lunch date in Kansas City over the next month where we could debate what we found interesting in this information.

Final note: Jeff also believes we need a small DC acquisition since our Unix platform will not be able to support the DC requirements of the Emerging business until 2009 per Bill Byerly. Pam and Jeff will think this through before they bring it to the team, but either way, getting really good at integrating acquisitions will probably need to be a core competency of our team.

Final-Final note:  As John Wooden once said:  "It is what you learn after you know it all that counts"


Tom Kmak
Chief Executive Officer
JP Morgan Retirement Plan Services
816-340-4424
thomas.r.kmak@jpmorgan.com

**EXHIBIT**

B

# C|D|G

## Childress Duffy Goldblatt

April 4, 2008

**By Facsimile (816 340-3430)**
**and U.S. Mail**
John Storey
Vice President, Human Resources
JP Morgan Retirement Services
9300 Ward Parkway
Kansas City, MO 64114

> **Re:**   *Wage Demand on behalf of Jeffrey Stevenson*

Dear Mr. Storey:

Please be advised that my firm represents Jeffrey Stevenson, who was formerly employed by JP Morgan Retirement Services. Pursuant to the Employment Non-Competition and Non-Solicitation Agreement between Mr. Stevenson and JP Morgan Retirement Services, Mr. Stevenson terminated his employment for "Good Reason," and he is entitled to receive, *inter alia*, his base salary during the non-competition period.

Mr. Stevenson's last day of employment was December 3, 2007 and his annual salary was $330,000. To date, more than 17 weeks have passed since Mr. Stevenson's employment was terminated. As such, he is owed $107,884.60 and pursuant to applicable law we hereby demand payment of such amount. Under the Agreement, wages owed to Mr. Stevenson will continue to accrue during the Non-Competition Period, and by this demand Mr. Stevenson reserves all rights he may have to recover all such amounts. Please contact me immediately to arrange payment of the unpaid wages currently owed.

Very truly yours,

CHILDRESS DUFFY GOLDBLATT, LTD.

Christopher N. Mammel

Cc:   Jeffrey Stevenson

**EXHIBIT**

C

## CERTIFICATE OF SERVICE

Sarah M. Konsky, an attorney, hereby certifies that she caused a true and correct copy of

the foregoing document to be served upon all counsel of record by hand delivery and U.S. Mail

to:

      Christopher N. Mammel
      Adam J. Betzen
      Childress Duffy Goldblatt, Ltd.
      515 North State Street, Suite 2200
      Chicago, Illinois  60610


on this 21st day of May, 2008.


                                      */s/ Sarah M. Konsky*