**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEFFREY W. STEVENSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08 CV 2947 |
| v. | ) | |
| | ) | Judge William T. Hart |
| J.P. MORGAN RETIREMENT PLAN | ) | |
| SERVICES LLC, a Limited Liability | ) | Magistrate Judge Maria Valdez |
| Company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES
TO PLAINTIFF'S COMPLAINT**

Defendant J.P. Morgan Retirement Plan Services LLC ("RPS"), by its attorneys, submits

the following Answer and Affirmative Defenses to Plaintiff Jeffrey W. Stevenson's

("Stevenson") Complaint:

**Complaint 1:** Jeffrey W. Stevenson is an individual who, at all times relevant, resided in
Prospect Heights, Illinois.  As shown more fully hereafter, this action concerns performance and
breach of agreements entered into between Stevenson and Defendant related to acquisition in
October 2006 of the companies in which Stevenson was a principal.

**ANSWER 1:**  Upon information and belief, RPS admits that Stevenson is an individual

who, at all times relevant to the above-captioned action, resided in Prospect Heights, Illinois.

RPS admits that Stevenson alleges in the above-captioned action the breach of an agreement

entered into between Stevenson and RPS.  RPS also admits that, in October 2006, it acquired

companies in which Stevenson had an ownership interest.  RPS denies the remaining allegations

in Paragraph 1.

**Complaint 2:** J. P. Morgan Retirement Plan Services LLC ("RPS") is a limited liability company with offices in Kansas City, Missouri and Chicago, Illinois, among other places.

**ANSWER 2:** RPS admits the allegations in Paragraph 2.

**Complaint 3**: Defendant RPS is a subsidiary of J. P. Morgan Asset Wealth Management, which is part of J. P. Morgan Chase & Co.

**ANSWER 3:** RPS denies the allegations in Paragraph 3.

**Complaint 4:** This Court has jurisdiction over Defendant because it maintains an office in Chicago and conducts on-going business in Illinois. Additionally, jurisdiction is proper in this Court because RPS entered into a contract with Stevenson in Illinois.

**ANSWER 4:** RPS admits that this Court has jurisdiction over it in the above-captioned action in the Northern District of Illinois. RPS admits that it maintains an office in Chicago, conducts business in Illinois, and entered into a contract with Stevenson in Illinois. RPS denies the remaining allegations in Paragraph 4.

**Complaint 5:** Pursuant to the "Non-Competition and Non-Solicitation Agreement," the parties have consented to jurisdiction and venue in any Court located within the State of Illinois. (A true and correct copy of the "Non-Competition and Non-Solicitation Agreement" is attached hereto as Exhibit A, hereinafter referred to as the "Employment Agreement".)

**ANSWER 5:** RPS admits that the Non-Competition and Non-Solicitation Agreement attached as Exhibit A to Stevenson's Complaint states that, in any suit arising out of or relating to the agreement, the parties consent to the jurisdiction of the federal or state courts located within the State of Illinois and waive the right to claim that any such suit has been commenced in an inconvenient forum. RPS denies the remaining allegations in Paragraph 5.

**Complaint 6:** Venue is proper in this Court because Stevenson worked out of Defendant's Chicago office and the contract at issue was formed and performed in Chicago.

**ANSWER 6:**  RPS admits that venue is proper in this Court.  RPS admits that Stevenson formerly worked in RPS's Chicago office.  RPS also admits that the contract on which Stevenson bases the above-captioned action was entered into and performed in Chicago.  RPS denies the remaining allegations in Paragraph 6.

**Complaint 7:**  Stevenson is licensed in Illinois as a lawyer and is an Enrolled Actuary under Federal law.

**ANSWER 7:**  On information and belief, RPS admits the allegations in Paragraph 7.

**Complaint 8:**  In 1999, Stevenson joined Chicago Consulting Actuaries, a 40 person actuarial consulting firm with one office in Chicago.  Chicago Consulting Actuaries subsequently changed its name to CCA Strategies LLC (hereafter "CCA").

**ANSWER 8:**  On information and belief, RPS admits the allegations in Paragraph 8.

**Complaint 9:**  By the time of the sale to RPS in 2006, CCA had over 200 employees and ten offices in the United States, and had recently established an office in Bangalore, India (for which Stevenson served as a director along with another CCA Managing Director).  CCA had 40 individuals who were members (also referred to as "owners" or "principals") of the firm.  Stevenson was a member of CCA and owned approximately 15% of CCA at the time of the acquisition.

**ANSWER 9:**  On information and belief, RPS admits that in October 2006, CCA had at least 10 offices in the United States, one office in Bangalore, India, and more than 200 employees, approximately 40 of whom were members of CCA.  On information and belief, RPS admits that in October 2006, Stevenson was a member of CCA and owned 13.850415 percent of CCA.  RPS is without sufficient information to form a belief as to whether Stevenson served as a director of CCA's office in Bangalore, India, and therefore it is denied.  RPS denies the remaining allegations in Paragraph 9.

**Complaint 10:**  At CCA, Stevenson served on the four member Executive Committee and was actively involved in broad firm leadership issues.  The Executive Committee also served as the firm's compensation committee and approved all firm compensation issues.

**ANSWER 10:**  On information and belief, RPS admits that Stevenson served on the Executive Committee of CCA.  RPS is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 10, and therefore they are denied.

**Complaint 11:**  Stevenson played an active role in establishing CCA's new offices.  This included the recruiting and mentoring of the people leading those offices, as well as new business opportunities for those offices.

**ANSWER 11:**  RPS is without information sufficient to form a belief as to the truth of the allegations in Paragraph 11, and therefore they are denied.

**Complaint 12:**  Stevenson was also involved at CCA in generating new business opportunities, both within the High Income Deferral practice and for other practice areas. Stevenson worked closely with many principals and employees at CCA in this respect.

**ANSWER 12:**  RPS is without information sufficient to form a belief as to the truth of the allegations in Paragraph 12, and therefore they are denied.

**Complaint 13:**  CCA had numerous relationships with third parties, and part of CCA's strategy for growth was to build on these relationships.  Stevenson was actively involved with many of these partners.  One such relationship was a quasi-joint venture with Citistreet whereby Citistreet and a number of other organizations, including CCA, formed an affiliation called Citistreet Consulting Services.  CCA was the actuarial and consulting arm of this venture. Stevenson was centrally involved in formulating the agreement under which CCA operated with Citistreet and served with the other members of the CCA Executive Committee on the Citistreet Advisory board.  This board generally met quarterly to discuss strategic issues and opportunities.

**ANSWER 13:**  RPS is without information sufficient to form a belief as to the truth of the allegations in Paragraph 13, and therefore they are denied.

**Complaint 14:**  Stevenson oversaw most of the legal issues and maintained all of CCA's relationships with outside counsel.  When CCA initiated its first lawsuit against a former member for breach of various agreements and covenants, Stevenson worked with outside counsel and led the litigation effort.  Stevenson worked with outside counsel on maintaining the various organizational documents (*e.g.*, Operating Agreement).

**ANSWER 14:**  RPS is without information sufficient to form a belief as to the truth of the

allegations in Paragraph 14, and therefore they are denied.

**Complaint 15:**  Stevenson was the leader of CCA's merger and acquisition practice area,
and was a primary liaison with CCA's law firm clients for new business opportunities (*e.g.*,
litigation support, M&A opportunities and general consulting assistance).  During 2006, CCA
completed its first acquisition, of Alfred W. Hayes Company in St. Louis, and Stevenson led the
legal efforts for this transaction.

**ANSWER 15:**  On information and belief, RPS admits that CCA acquired W. Alfred

Hayes & Company in 2006.  RPS is without information sufficient to form a belief as to the truth

of the remaining allegations in Paragraph 15, and therefore they are denied.

**Complaint 16:**  In the late 1990's Congress changed the tax laws in a way that eventually
lead to the creation of the High Income Deferral practice.  Stevenson was one of the pioneers in
recognizing and developing the ability to use a defined benefit pension plan in ways that would
allow significant tax-deductible income deferrals for business owners, and in particular, partners
of major law firms.

**ANSWER 16:**  RPS is without information sufficient to form a belief as to the truth of the

allegations in Paragraph 16, and therefore they are denied.

**Complaint 17:**  CCA did not do any significant consulting in the "tax-focused" market, or
in the large law-firm market that Stevenson was interested in developing.  Accordingly,
Stevenson started from scratch building this practice, which became known in the industry as
"Partner Parity Plan" business ("Parity").

**ANSWER 17:**  On information and belief, RPS admits that Stevenson developed a practice

called the Partner Parity Plan ("Parity").  RPS is without information sufficient to form a belief

as to the truth of the remaining allegations in Paragraph 17, and therefore they are denied.

**Complaint 18:**  Over the following few years, Stevenson was able to develop the leading
practice in this country that focused on major law firms.  This practice grew to represent nearly
30% of the firms in the AmLaw 100, and approximately 60 firms overall.  The income deferrals

made by the partners/owners who had established a Parity plan with CCA were approaching $2 billion by the end of 2007.

**ANSWER 18:**  RPS is without information sufficient to form a belief as to the truth of the allegations in Paragraph 18, and therefore they are denied.

**Complaint 19:**  The concepts that made the Parity plan attractive to partners of major professional service firms were also applicable to executives in large corporations.  Stevenson determined that the High Income Deferral opportunity could apply to large corporations in a very meaningful way and created what became referred to within CCA as the Qmax Program ("Qmax").  Stevenson implemented the approach at a number of firms on a small scale, and then through a joint marketing agreement CCA entered into with Bank of America (which Stevenson organized), CCA was retained by a large international technology company who eventually implemented the strategy and funded over $200 million of executive nonqualified deferrals.

**ANSWER 19:**  RPS is without information sufficient to form a belief as to the truth of the allegations in Paragraph 19, and therefore they are denied.

**Complaint 20:**  This High Income Deferral design was also attractive for smaller firms. The problem with the small firm market was that the design approach used with a typical Parity assignment was expensive and high-touch, which made distribution on a large scale difficult. However, Stevenson believed that these obstacles could be overcome through technology and partnerships with financial advisors and institutions.  In early 2004, CCA authorized Stevenson and his team to develop this concept further and they launched efforts to build an automated system that would streamline the process and make the small company market an attractive strategy to pursue.

**ANSWER 20:**  RPS is without information sufficient to form a belief as to the truth of the allegations in Paragraph 20, and therefore they are denied.

**Complaint 21:**  Because this endeavor would be a technology driven business, CCA decided to establish the business in a new entity, CCA Small Business Group LLC ("SBG").

**ANSWER 21:**  On information and belief, RPS admits that CCA established an entity called CCA Small Business Group LLC ("SBG").  RPS is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 21, and therefore they are denied.

**Complaint 22:**  Stevenson held the position of President of SBG (in addition to his duties within CCA).  Stevenson owned approximately 20% of the business.  The remaining ownership was by other CCA members and employees, either through direct ownership or indirectly through their ownership in CCA.

**ANSWER 22:**  On information and belief, RPS admits that Stevenson held the position of President of SBG and owned 21.31753 percent of SBG.  On information and belief, RPS admits that the remainder of SBG was owned by other CCA members and employees.  RPS is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 22, and therefore they are denied.

**Complaint 23:**  SBG had its first product launch in December 2004 with "MyMax." MyMax was the first fully-automated defined benefit plan module that allowed a person (or their financial advisor) to model, design and establish and individual defined benefit plan all on-line and in real time.  The product was only for business owners who were sole proprietors.  What once took weeks to complete could now be done in mere minutes on-line.  The second product, OurMax, was launched in 2005.  OurMax automated the design process applicable to High Income Deferral plans, and made such plans available to smaller firms.

**ANSWER 23:**  On information and belief, RPS admits that SBG developed products called "MyMax" and "OurMax."  RPS is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 23, and therefore they are denied.

**Complaint 24:**  Stevenson and his team worked to forge relationships with several financial institutions as distribution partners for the MaxPlans, and supported a network of independent registered investment advisors ("RIA").  Although SBG was still in its infancy stage, it was having success in the market place and was quickly becoming recognized as the leader in this High Income Deferral market.

**ANSWER 24:**  RPS is without information sufficient to form a belief as to the truth of the allegations in Paragraph 24, and therefore they are denied.

**Complaint 25:**  All of the employee/members who worked on a High Income Deferral assignment (whether a Parity, Qmax or SBG project) were employed by CCA.  SBG would use those CCA employees as it needed, and CCA would charge SBG for a portion of the employee's

cost. A group of employees, primarily developers and administrative persons (non-actuaries) involved with SBG, were leased "full-time" from CCA.

**ANSWER 25:** RPS is without information sufficient to form a belief as to the truth of the allegations in Paragraph 25, and therefore they are denied.

**Complaint 26:** RPS first approached CCA in October 2005, seeking to meet and discuss possible business opportunities.

**ANSWER 26:** RPS states that its representatives first approached CCA in September 2005 regarding possible business opportunities. RPS denies the remaining allegations in Paragraph 26.

**Complaint 27:** The Executive Committee (including Stevenson) met with Tom Kmak (founder and CEO of RPS) and Pam Popp in December, 2005, to discuss various options, at which time Kmak and Popp indicated RPS's desire to buy CCA and SBG.

**ANSWER 27:** RPS admits that Tom Kmak and Pam Popp met with Stevenson and other representatives of CCA in December 2005 regarding possible business opportunities. RPS admits that Kmak formerly was the CEO of RPS. RPS admits that, in or after December 2005, Kmak and Popp indicated an interest in RPS purchasing CCA and SBG. RPS denies the remaining allegations in Paragraph 27.

**Complaint 28:** Stevenson, along with another CCA member, led the JPMorgan transaction activities. During the summer/fall of 2006 most of Stevenson's time was devoted to finalizing and closing this transaction.

**ANSWER 28:** On information and belief, RPS admits that Stevenson was one of the participants in the J.P. Morgan transaction activities on behalf of CCA. RPS is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 28, and therefore they are denied.

**Complaint 29:**  As part of the JPMorgan merger, Stevenson was appointed by the 40 CCA members as the Holder Representative, which means Stevenson represents all members in any dispute that arises with JPMorgan under the merger documents.

**ANSWER 29:**  RPS admits that, pursuant to the terms of the applicable Agreement and Plan of Merger, a Holder Representative represents members in disputes with RPS arising under the Agreement and Plan of Merger.  RPS admits that Stevenson was appointed by the CCA members as the Holder Representative.  RPS denies the remaining allegations in Paragraph 29.

**Complaint 30:**  RPS bought CCA and SBG on October 2, 2006 ("Closing Date").  The acquisition was a merger, whereby CCA was merged into CCA Acquisition LLC and SBG was merged into SBG Acquisition LLC, both of which entities were wholly owned by RPS.  The names of each acquisition entity was renamed (to CCA and SBG respectively) after the transaction.  As a condition of the merger, Stevenson, along with four other Senior Executives of CCA, were required to execute a Non-Competition and Non-Solicitation Agreement.  They were also assured continuation of their strategic and leadership roles and compensation levels immediately prior to the acquisition in the acquired companies.  *See* Ex. A, ¶ 12(a)(no termination without "Just Cause" and termination by Executive for "Good Reason" continues compensation during restrictive periods.)

**ANSWER 30:**  RPS admits that it acquired CCA and SBG on October 2, 2006 (the "Closing Date").  RPS admits that the acquisition was structured as a merger in which RPS acquired 100% of the membership interests of CCA and SBG pursuant to forward subsidiary merger transactions.  RPS admits that Stevenson and certain other employees of CCA signed Non-Competition and Non-Solicitation Agreements with RPS.  RPS denies the remaining allegations in Paragraph 30.

**Complaint 31:**  In or around late November 2006, Stevenson met with Kmak and was told that the merged RPS/CCA business would be restructured into three component parts:  First, the primary RPS 401k business would be combined with the CCA Defined Benefits administration business.  This would be referred to as the "Institutional" or "TBO" group and the leader of this group would be appointed soon.  Second, the High Income Deferral line of business that Stevenson had created would be combined with the small 401k business from RPS, and this group would be referred to as "Emerging Markets."  Kmak indicated that Stevenson would be the CEO of this business.  Finally, the remaining pieces of CCA would be in a third business line

called "Consulting," with the former President from CCA as the CEO. Each of these three businesses would report up to Kmak, who would be the CEO of RPS. Stevenson would serve on the Executive Committee of RPS (along with the other senior people from RPS and CCA).

**ANSWER 31:** RPS is without information sufficient to form a belief as to the truth of the allegations in Paragraph 31, and therefore they are denied.

**Complaint 32:** This position of CEO of the Emerging Markets group and member of the combined RPS/CCA Executive Committee was consistent with Stevenson's role and position prior to the merger. Stevenson had been President of SBG, which would become a central part of the Emerging Markets group, and he had been a managing director and Executive Committee member for CCA, the bulk of which would become the Consulting group. Thus, the position Kmak promised to Stevenson was consistent with his responsibilities prior to the merger. He would continue to build and lead the High Income Deferral practice while being involved in the formulation of overall strategy of the combined firm. Moreover, combining RPS' small 401k line of business under Stevenson's High Income Deferral business was consistent with the long-term strategy to use a defined contribution recordkeeping platform as the platform for the High Income Deferral plans.

**ANSWER 32:** On information and belief, Stevenson had been President of SBG and an Executive Committee Member for CCA. RPS is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 32, and therefore they are denied.

**Complaint 33:** December 20, 2006, Kmak told Stevenson that the positions heading up the three new units would not be CEO titles, but would instead be COO titles. Also, he informed Stevenson that Popp would be the COO of Emerging Markets and that Stevenson would report to her with the title of Managing Director. However, Kmak assured Stevenson that (1) he would be a partner with Popp so he would remain peer-to-peer organizationally, (2) he would maintain his role on the Executive Committee of RPS (along with other senior people from RPS and CCA), the combined organization, and (3) he would continue to be a critical person in developing the strategies to build the entire RPS/CCA business.

**ANSWER 33:** RPS is without information sufficient to form a belief as to the truth of the allegations in Paragraph 33, and therefore they are denied.

**Complaint 34:** In an email on January 6, 2007, Kmak announced the new structure and leadership team for RPS. (A true and correct copy of the email is attached hereto as Exhibit B.)

**ANSWER 34:**  RPS admits that Kmak sent an email to Stevenson on January 6, 2007.

RPS denies the remaining allegations in Paragraph 34.


**Complaint 35:**  Because of other decisions made by Defendant, as alleged hereafter, Stevenson was never permitted to assume the responsibilities of an officer overseeing the Emerging Markets group or of the combined RPS/CCA businesses.

**ANSWER 35:**  RPS denies the allegations in Paragraph 35.


**Complaint 36:**  At some point in December 2006, Eve Guernsey, CEO of the Americas Division for J. P. Morgan Chase, decided that the Consulting group would be separated from the other groups within RPS.  Guernsey decided that the Consulting group would not report to Kmak and would instead report directly to her.  Stevenson's discussion with Kmak on December 20 was not consistent with the changes dictated by Guernsey and Stevenson was not informed of those changes.  Stevenson had not been involved in the discussions concerning the separation of the Consulting practices.

**ANSWER 36:**  RPS admits that Eve Guernsey is CEO of the Americas Division for J.P. Morgan Chase.  RPS admits that, in December 2006, it was decided that the Consulting group would be separated from RPS and would report directly to Guernsey.  RPS denies that Guernsey made that decision.  On information and belief, RPS admits that Stevenson was not involved in discussions concerning the separation of the Consulting group.  RPS is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 36, and therefore they are denied.


**Complaint 37:**  Based on the structure announced to Stevenson by Kmak, he would continue to work with his former partners in CCA in setting the strategic decisions for the newly created Consulting group.  However, following Guernsey's changes, Stevenson's position with the Emerging Markets group became entirely separated from the Consulting group.

**ANSWER 37:**  RPS admits that, in December 2006, it was decided that the Consulting group would be separated from RPS, and thus from the RPS Emerging Markets group.  RPS

denies that Guernsey made that decision. RPS is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 37, and therefore they are denied.

**Complaint 38:** Additionally, the Consulting group formed a separate senior leadership team which did not include Stevenson.

**ANSWER 38:** RPS admits that, following the separation of the Consulting group from RPS, the senior leadership team of the Consulting group did not include Stevenson. RPS denies the remaining allegations in Paragraph 38.

**Complaint 39:** Because of the separation between the Consulting group and the other RPS groups, Stevenson was no longer allowed to work with his former partners from CCA and was not involved in business activities that pertained to the Consulting group shortly after the merger.

**ANSWER 39:** RPS denies the allegations in Paragraph 39.

**Complaint 40:** The decision to separate the Consulting group from the Emerging Markets prevented Stevenson from fulfilling his duties as an executive with the CCA/Consulting group.

**ANSWER 40:** RPS denies the allegations in Paragraph 40.

**Complaint 41:** The split of the Consulting group also caused confusion for the employees working on High Income Deferral projects, including confusion around who actually supervised these employees. Because of the internal conflict that existed between RPS and Consulting, a hostile environment formed, which made coordination of efforts difficult. Most of the actuaries and consultants that managed the Parity line of business were still "employed" within the Consulting groups, even though that business was in the Emerging Markets line of business (under RPS). During the summer of 2007, Guernsey made the decision that the Parity actuaries/consultants could move to Emerging Markets. However, Emerging Markets would need to post for the positions, and those employed in the Consulting group would need to apply for such positions. Emerging Markets posted for 18 positions and every employee that Emerging Markets had targeted elected to apply and eventually became employees of Emerging Market. This separation finally resulted in elimination of Stevenson's Executive role within RPS in connection with the Consulting group.

**ANSWER 41:** RPS admits that, following the separation of the Consulting group from RPS, many of the actuaries and consultants who managed the Parity line of business were

assigned to the Consulting group.  RPS admits that, during the summer of 2007, it was decided

that actuaries and consultants who managed the Parity line of business would be permitted to

apply for positions in the Emerging Markets group.  RPS denies that Guernsey made that

decision.  RPS admits that approximately 18 employees in the Consulting group applied for and

were granted positions within the Emerging Markets group.  RPS denies the remaining

allegations in Paragraph 41.

**Complaint 42:**  In August 2007, Kmak announced that he was leaving RPS and that
Guernsey would be acting CEO of RPS.  Shortly thereafter, Popp notified Stevenson that
Guernsey had established a new Executive Committee that excluded Stevenson.

**ANSWER 42:**  RPS admits that, in August 2007, Kmak announced that he would no

longer be CEO of RPS and Guernsey became interim CEO of RPS.  RPS also admits that

Guernsey established a new committee that she called the "Executive Committee," but that had a

different function than the previous RPS Executive Committee.  RPS admits that Popp notified

Stevenson that he would not be a member of the new committee called the "Executive

Committee."  RPS denies the remaining allegations in Paragraph 42.

**Complaint 43:**  Earlier, after Popp had been installed to head the Emerging Markets group
instead of Stevenson, Kmak had indicated to Stevenson that Kmak considered him essentially
peer-to-peer with Popp.  However, with Kmak gone, Popp no longer was required to treat
Stevenson as an equal.

**ANSWER 43:**  RPS is without information sufficient to form a belief as to the truth of the

allegations in Paragraph 43, and therefore they are denied.

**Complaint 44:**  By September 2007, it was clear that Popp wanted Stevenson to fill a
subordinate position equal to that held by Jeff Kargl, who acted as a manager of his respective
line of business.  Kargl was in charge of the defined contribution line of business within
Emerging Markets.  Popp indicated that Stevenson would take on administrative and managerial
duties of supervising employees, budget, and day-to-day operations.  Stevenson's authority

within the High Income Deferral market was significantly diminished, and his authority within consulting was eliminated.

**ANSWER 44:**  RPS admits that Stevenson was expected to perform certain administrative and managerial duties, including supervising employees, the budget, and day-to-day operations. RPS admits that Jeff Kargl was in charge of the defined contribution line of business within the Emerging Markets group of RPS.  RPS denies the remaining allegations in Paragraph 44.

**Complaint 45:**  Popp had assumed Stevenson's duties for the businesses he created and built.  Stevenson's role then had to be reduced to become merely administrative and managerial, a role that he did not perform previously.  Stevenson's responsibility became equal to that of Kargl, a Vice President and manager in a position compensated at less than half of the amount Stevenson historically made.  Stevenson no longer had strategic responsibilities.

**ANSWER 45:**  RPS denies the allegations in Paragraph 45.

**Complaint 46:**  Popp realized that Stevenson was not satisfied with the role she had crafted for him and the reduction in responsibilities.  Popp came to Chicago to see what could be worked out to restore some of Stevenson's responsibility and duties, and stated that she was open to crafting a new position.  But she stated that in order to do so Stevenson would have to take a substantial pay cut to come more in line with the position level.

**ANSWER 46:**  RPS admits that Popp traveled to Chicago to meet with Stevenson and, during that meeting, stated that she was open to the possibility of crafting a new position for Stevenson if he was not satisfied with his current position.  RPS denies the remaining allegations in Paragraph 46.

**Complaint 47:**  In the fall of 2007 Popp had been holding back announcement of the Emerging Markets organization chart because Popp was concerned that Stevenson might resign as a result of the material diminution in his authority and position.  Stevenson agreed with Popp that it would be harmful to the team if an organization chart was announced with Stevenson as the leader and then shortly thereafter it had to be revised.  Thus Stevenson was pressured to finalize his decision on whether to accept the diminished position or leave the company.

**ANSWER 47:**  RPS denies the allegations in Paragraph 47.

**Complaint 48:**  Stevenson was not willing to accept the reduced position, but agreed with Popp that it would be best for JPMorgan's interest to complete the reorganization decisions expeditiously, announce his departure as a retirement, and then unveil the new team structure as soon as possible.  Popp stated that she didn't want to convey any type of message that RPS was forcing Stevenson out, though the only position available for him was not equivalent to the duties or responsibilities of his prior positions.

**ANSWER 48:**  RPS denies the allegations in Paragraph 48.

**Complaint 49:**  Popp also was anxious for Stevenson to provide formal notice of his departure so that she could remove him from the budget for 2008.  Removal of Stevenson's position eliminated a considerable expense in Popp's budget for the Emerging Markets team.

**ANSWER 49:**  RPS denies the allegations in Paragraph 49.

**Complaint 50:**  Stevenson reluctantly submitted a resignation document designed to preserve his rights to promised compensation for the sale of his stake in the business, and was not required by JPMorgan to execute any separation agreement, release or other legal documents waiving his contractual rights under the terms of the sale or his employment.  Stevenson's last day of employment with Defendant was December 3, 2007.

**ANSWER 50**:  RPS admits that Stevenson submitted a resignation document to RPS, which stated that his resignation was effective December 3, 2007.  RPS admits that Stevenson's last day of employment with RPS was December 3, 2007.  RPS admits that Stevenson was not required at the time of the termination of his employment to execute a separation agreement, release, or other legal document waiving his contractual rights under the terms of the sale of CCA or his employment with RPS.  RPS denies the remaining allegations in Paragraph 50.

## Count I
## Breach of Contract

**Complaint 51:**  Paragraphs 1-50 of this Complaint are incorporated herein as paragraph 51 of Count I as though fully restated.

**ANSWER 51:**  RPS incorporates its Answers to Paragraphs 1-50 of the Complaint above as its answer to Paragraph 51 as though fully restated.

**Complaint 52:**  Stevenson and Defendant entered into the Employment Agreement.  *See* Ex. A.  The Parties executed the Employment Agreement on September 12, 2006.

**ANSWER 52:**  RPS admits that Stevenson and RPS entered into a Non-Competition and Non-Solicitation Agreement, which was executed on September 12, 2006.  RPS denies the remaining allegations in Paragraph 52.

**Complaint 53:**  The Employment Agreement provides, *inter alia*, restrictive covenants prohibiting competition, solicitation of customers and solicitation of employees by Stevenson under certain circumstances.

**ANSWER 53:**  RPS admits that the Non-Competition and Non-Solicitation Agreement contains restrictive covenants prohibiting competition, solicitation of customers, and solicitation of employees under certain circumstances.  RPS denies the remaining allegations in Paragraph 53.

**Complaint 54:**  The Employment Agreement provides that Stevenson shall be compensated during the Non-Competition Period (defined in the contract as three years from the closing date of the merger) if Stevenson is terminated other than for "Just Cause" or if Stevenson terminates his employment for "Good Reason," as defined in the contract.

**ANSWER 54:**  RPS admits that the Non-Competition and Non-Solicitation Agreement provides that Stevenson shall be compensated during the "Non-Competition Period" (as defined in that Agreement) if Stevenson is terminated other than for "Just Cause" (as defined in that Agreement) or if Stevenson terminates his employment for "Good Reason" (as defined in that Agreement).  RPS denies the remaining allegations in Paragraph 54.

**Complaint 55:**  As alleged *supra*, Defendant created circumstances that constituted "Good Reason."

**ANSWER 55:**  RPS denies the allegations in Paragraph 55.

**Complaint 56:**  Stevenson agreed to terminate his employment for Good Reason because of the material diminution of his duties and interference with his carrying out of his duties and because he was unable to carry out his duties.

**ANSWER 56:**  RPS denies the allegations in Paragraph 56.

**Complaint 57:**  Defendant has not paid the compensation owed to Stevenson under the Employment Agreement.

**ANSWER 57:**  RPS denies that compensation is owed to Stevenson under the Non-Competition and Non-Solicitation Agreement.  RPS therefore denies the allegations in Paragraph 57.

**Complaint 58:**  Defendant is in breach of the Employment Agreement, which has directly caused Stevenson damages based on the amounts to which he is entitled under the contract.

**ANSWER 58:**  RPS denies the allegations in Paragraph 58.

WHEREFORE, Plaintiff asks this Court to enter a judgment against the Defendant granting the following relief:

    a)    Damages under the Employment Agreement in the form of unpaid compensation, including salary and bonuses, as provided for in the contract, in an amount to be proved at trial in excess of $50,000;

    b)    Damages under the Employment Agreement for retirement, health and income protection benefits as provided for in the contract;

    c)    Damages under the Employment Agreement for the "Earn-Out" bonus as provided for under Annex H of the Purchase Agreement and referred to in the Employment Agreement; and

    d)    Any other relief as this Court deems equitable and fair.

**ANSWER TO PRAYER FOR RELIEF:**  In response to Stevenson's prayer for relief, RPS denies that Stevenson is entitled to any of the relief sought.

## Count II
## Declaratory Judgment

**Complaint 59:**  Paragraphs 1-50 of this Complaint are incorporated herein as paragraph 59 of Count II as though fully restated.

**ANSWER 59:**  RPS incorporates its Answers to Paragraphs 1-50 of the Complaint above as its answer to Paragraph 59 as though fully restated.

**Complaint 60:**  Count II is plead in the alternative to Count I.

**ANSWER 60:**  RPS admits that Stevenson purports to plead Count II in the alternative to Count I.

**Complaint 61:**  Defendant is in material breach of the Employment Agreement.

**ANSWER 61:**  RPS denies the allegations in Paragraph 61.

**Complaint 62:**  The Employment Agreement purports to provide restrictive covenants requiring non-competition, non-solicitation of customers and non-solicitation of employees by Stevenson in the event of termination of his employment.

**ANSWER 62:**  RPS admits that Stevenson's Non-Competition and Non-Solicitation

Agreement contains restrictive covenants that place certain non-competition and non-solicitation

obligations on Stevenson in the event of termination of his employment.  RPS denies the

remaining allegations in Paragraph 62.

**Complaint 63:**  The Employment Agreement places undue burdens on Stevenson's ability to pursue his line of work.

**ANSWER 63**:  RPS denies the allegations in Paragraph 63.

**Complaint 64:**  Stevenson faces immediate damages from his continued efforts to avoid any violation of the restrictive covenants, though Defendant has refused to perform its obligations under the Employment Agreement in light of termination for "Good Reason".

**ANSWER 64:**  RPS denies the allegations in Paragraph 64.

WHEREFORE, Plaintiff asks this Court to enter a judgment against the Defendant granting the following relief:

a) A declaratory judgment that Defendant has materially breached the provisions of the Employment Agreement;

b) A declaratory judgment further determining that the restrictive covenants in the Employment Agreement are unenforceable due to Defendant's material breach; and

c) Any other relief as this Court deems equitable and fair.

**ANSWER TO PRAYER FOR RELIEF:**  In response to Stevenson's prayer for relief,

RPS denies that Stevenson is entitled to any of the relief sought.

### Count III
### Illinois Wage Payment Collection Act
### (820 ILCS 115/1 et seq.)

**Complaint 65:**  Paragraphs 1-50 of this Complaint are incorporated herein as paragraph 65 of Count III as though fully restated.

**ANSWER 65:**  RPS incorporates its Answers to Paragraphs 1-50 of the Complaint above as its answer to Paragraph 65 as though fully restated.

**Complaint 66:**  Stevenson was an employee of the Defendant.

**ANSWER 66**:  RPS admits that Stevenson was an employee of RPS from October 2, 2006, through December 3, 2007.  RPS otherwise denies the allegations in Paragraph 66.

**Complaint 67:**  Under the Employment Agreement, Stevenson is owed final compensation during the non-compete period.

**ANSWER 67:**  RPS denies the allegations in Paragraph 67.

**Complaint 68:**  Defendant, being able to pay the final compensation, willfully refuses to pay after demand.

**ANSWER 68:**  RPS states that Stevenson is not owed any final compensation.  RPS therefore denies the allegations in Paragraph 68.

**Complaint 69:**  Defendant is in violation of the Illinois Wage Payment and Collection Act.

**ANSWER 69:**   RPS denies the allegations in Paragraph 69.


WHEREFORE, Plaintiff asks this Court to enter a judgment against the Defendant granting the following relief:

      a)     Judgment for damages owed to the Plaintiff for unpaid final compensation, as provided for in the Employment Agreement, in an amount to be provided at trial in excess of $50,000;

      b)     Judgment for damages owed to the Plaintiff for unpaid "Earn-Out" bonus as provided for under the Purchase Agreement and referred to in the Employment Agreement;

      c)     Interest on the amount of the unpaid final compensation; and

      d)     Any other relief as this Court deems equitable and fair.

**ANSWER TO PRAYER FOR RELIEF:**   In response to Stevenson's prayer for relief,

RPS denies that Stevenson is entitled to any of the relief sought.


### Count IV
### Illinois Attorneys Fees in Wage Actions Act
### (225 ILCS 225/1)

**Complaint 70:**   Paragraphs 1-50 of this Complaint are incorporated herein as paragraph 70 of Count IV as though fully restated.

**ANSWER 70:**   RPS incorporates its Answers to Paragraphs 1-50 of the Complaint above

as its answer to Paragraph 70 as though fully restated.


**Complaint 71:**   Stevenson issued a written demand to Defendant at least 3 days before this action was brought.  (A true and correct copy of the written demand is attached to as Exhibit C.)

**ANSWER 71**:   RPS admits that Stevenson issued a written demand to RPS at least 3 days

before this action was brought.  RPS otherwise denies the allegations in Paragraph 71.


**Complaint 72:**   The written demand stated a sum certain of wages owed to Stevenson in minimum amount of $107, 884.60 due and owing.

**ANSWER 72:**   RPS admits that the written demand alleges that wages in the minimum amount of $107,884.60 were due and owing.  RPS denies the remaining allegations in Paragraph 72.

**Complaint 73:**   The amount of wages stated is earned and due and owing under the Employment Agreement, and this action was brought to establish the amount is justly due and owing.

**ANSWER 73:**   RPS denies the allegations in Paragraph 73.

WHEREFORE, Plaintiff asks this Court to enter a judgment against the Defendant granting the following relief:

    a)    Allow Plaintiff a reasonable attorneys' fee to be taxed as costs of the action;

    b)    Judgment for the full amount of wages found due and owing under the Agreement at the time of judgment;

    c)    Any other relief as this Court deems equitable and fair.

**ANSWER TO PRAYER FOR RELIEF:**   In response to Stevenson's prayer for relief, RPS denies that Stevenson is entitled to any of the relief sought.

## <u>AFFIRMATIVE DEFENSES</u>

### FIRST AFFIRMATIVE DEFENSE

Stevenson fails to state a claim against RPS upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Stevenson's claims are barred by the doctrine of unclean hands.

### THIRD AFFIRMATIVE DEFENSE

Stevenson's claims and alleged damages are the result of Stevenson's own conduct.

Respectfully submitted,

J. P. MORGAN RETIREMENT PLAN
SERVICES LLC


By:     _/s/ Sarah M. Konsky_
                One of Its Attorneys

Brian J. Gold
Sarah M. Konsky
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

## <u>CERTIFICATE OF SERVICE</u>

Sarah M. Konsky, an attorney, hereby certifies that on June 12, 2008, she electronically

filed the attached with the Clerk of Court using the CM/ECP system, which will send notification

of such filing to the following counsel for Plaintiff:

Christopher N. Mammel
Adam J. Betzen
Childress Duffy Goldblatt, Ltd.
515 North State Street, Suite 2200
Chicago, Illinois  60610


_____ */s/ Sarah M. Konsky* _____

CH1 4279350v.1